Filed 6/20/25  P. v. Garcia CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VICTORIA SOLEDAD GARCIA,<br><br>        Defendant and Appellant. | A164991<br><br>(San Mateo County<br>Super. Ct. No. 19NF013040A) |

Defendant Victoria Soledad Garcia killed her boyfriend by stabbing him once in the shoulder during an argument about his infidelity.  A jury convicted her of second degree murder and found that she personally used a deadly or dangerous weapon during the crime.  Based on statements Garcia made to her 11-year-old daughter at the scene, she was also convicted of dissuading a witness from reporting a crime.  The trial court sentenced Garcia to 16 years to life in prison.

On appeal, Garcia claims the trial court prejudicially erred by (1) responding to a jury question about the knowledge element of implied malice; (2) denying her motion to exclude part of her interrogation after a 13-minute gap that was not recorded;[1] and (3) failing to instruct the jury on the

_____

[1] We shall call this motion Garcia's "*Trombetta/Youngblood* motion," in reference to two United States Supreme Court cases that require the prosecution to retain and disclose exculpatory evidence.  (*California v.*

correct form of witness dissuasion.  She also raises a claim of cumulative error and asks us to review the court's denial of her motion to compel discovery of relevant information in the personnel file of a police officer involved in the case.[2]

We agree with Garcia that her murder conviction must be reversed because the trial court prejudicially erred in instructing the jury on the knowledge element of implied malice.[3]  But we conclude the court properly denied her *Trombetta/Youngblood* motion, and we reject her associated claim that her trial counsel provided ineffective assistance by not also seeking to exclude the relevant evidence under Penal Code[4] section 859.5, which generally requires a murder suspect's interrogation to be recorded.[5]  Finally, although we reject Garcia's remaining claims as to the witness-dissuasion conviction, we conditionally reverse it because the appellate record is inadequate to permit review of the court's *Pitchess* ruling.

---

*Trombetta* (1984) 467 U.S. 479 (*Trombetta*); *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*).)

[2]  We shall refer to this motion as Garcia's *Pitchess* motion, in reference to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

[3] As a result, we need not address Garcia's claim that the trial court also improperly instructed the jury on the union of act and intent for voluntary manslaughter.

[4] All further statutory references are to the Penal Code unless otherwise noted.

[5] By separate order, we deny Garcia's petition for a writ of habeas corpus premised on the same alleged ineffective assistance of counsel.  (*In re Victoria Soledad Garcia* (A170529).)

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

### A. Background

Garcia, who speaks Spanish only, was born in El Salvador in 1989 and moved to the United States in 2011. She has two daughters, V., who was born in April 2008, and K., who was born in December 2011.

In early 2015, Garcia met Alderete, who was about five years older than she, at a restaurant where they both worked. The two immediately began dating. At the time, Garcia and her daughters were temporarily staying with a friend after living in their car, and Alderete invited them to move into his single-wide trailer in a South San Francisco mobile-home park. Garcia agreed, considering it a "blessing" to find housing. Alderete's parents and sister also lived in the same mobile-home park, about a two-minute walk away.

Alderete and Garcia did not marry, but she referred to him as her husband. He treated V. and K. well, and they considered him their father. As discussed further in section I.H. below, there was significant evidence of domestic violence between Alderete and Garcia, including Garcia's statements to the police and testimony that he physically abused her on numerous occasions.

It is undisputed that Garcia killed Alderete by stabbing him once in the shoulder with a kitchen knife. At trial, the main contested issue was Garcia's mind state in doing so. She claimed that she acted in self-defense after Alderete choked her, but her claim was called into question by her shifting story and admitted lies, V.'s statements to the police immediately after the killing, and the physical evidence.

3

*B.*     *Garcia Learns of Alderete's Infidelity.*

On the morning of October 7, 2019, the day of the killing, Garcia was at her job maintaining plants at commercial buildings. She logged into her Facebook account and saw she had direct messages from a woman, I. In the messages, which were from the previous August, I. told Garcia, "[S]orry, but Christian is an idiot . . . [and] only plays with women . . . . Don't worry. I have nothing with him." I. had also made several missed calls to Garcia through Facebook Messenger.

At trial, I. testified that she met Alderete through work and dated him from February through October 2019. Alderete told I. "[f]rom the very beginning" that he was involved with Garcia. I. first attempted to communicate with Garcia in March 2019, after Alderete told I. that he and Garcia "were separating." I. messaged Garcia on Facebook to ask whether this was true, but Garcia did not respond.

Around 11:00 a.m. on October 7, Garcia messaged I., apologizing for not seeing her earlier messages and asking to talk to her. Garcia also made two missed calls to I. through Facebook Messenger. Garcia then took screenshots on her cell phone of I.'s profile page and the August messages and missed calls.

Garcia finished work at 1:30 p.m., and she drove to the South San Francisco elementary school where 11-year-old V. was in fifth grade and 7-year-old K. was in second grade to wait for their release at 2:45 p.m. Around 2:20 p.m., Garcia made another missed call to I. through Facebook Messenger. I. immediately messaged her, "Something not important sorry. But no more." Garcia responded by calling I. again, but I. did not answer.

Garcia and I. then exchanged several messages, with Garcia pressing I. for details about her relationship with Alderete and I. insisting her

4

relationship with him was over. After Garcia asked whether I. had sex with Alderete, saying "that [was] the only thing that matter[ed] to [her]," I. answered affirmatively. Garcia then repeatedly asked whether I. loved Alderete, stating that she no longer did and could "give him" to I. After telling Garcia not to "mortify [her]self," I. repeated that her relationship with Alderete was over. Garcia responded, "Well I'll give him to you. I don't want that garbage. But thank you for telling me." I. sent several more messages that Garcia did not answer, saying that Garcia needed Alderete more than I. did and that I. would not "bother" Garcia again.

### C. *Garcia Returns Home and Kills Alderete.*

Aside from Garcia's own statements and testimony, which we discuss in detail in sections I.F. and I.G. below, the primary eyewitness evidence about the lead-up to the killing and its aftermath came from V. Officers from the South San Francisco Police Department interviewed V. three times in the hours after the killing, and an officer and deputy district attorney interviewed her again about 10 months later.[6] Recordings of all four interviews were played for the jury. V. and K. also testified at trial, when they were 13 years old and 9 years old respectively, but no out-of-court statements by K. were introduced into evidence. Most of V.'s observations described below came from her police interviews, as at trial V. testified that she could not remember much of what happened and had lied to the police about several details.[7]

---

[6] All other references to the police in this opinion are to members of the South San Francisco Police Department. Officer Kathleen Walsh, who conducted the first interview of V. and interacted with both children that night, was the subject of Garcia's *Pitchess* motion.

[7] The trial court specifically found that "the vast majority of the time that [V.] said [on the stand that] she didn't recall, it was an effort to be

5

Around 3:00 p.m., Garcia picked up V. and K. from school and took them home, a 10-minute drive. During the ride, Garcia was talking to someone on her cell phone. V. heard the other person mention "cheating," and Garcia said she was "gonna talk with [Alderete] and . . . put [the kids] outside so [they] cannot hear what [their parents are] saying."[8]

Upon arriving home, Garcia told her daughters to stay outside while she talked to Alderete. Alderete, who worked in construction and had finished for the day, was sleeping on the primary bedroom's floor. The evidence about what happened next was muddled, largely because V.'s report to the police was not linear and Garcia's story changed several times. We recount in some detail the differing evidence because where and when Garcia picked up the knife she used to stab Alderete affects our analysis of the trial court's instructions regarding the knowledge element of implied malice.

According to V., Garcia, who had "a cranky face," woke Alderete up by "pick[ing] his arm up really hard." K. testified that Garcia seemed "angry" and Alderete "looked angry and scared at the same time." V. observed parts of what occurred between her parents, but she was not always clear about the sequence of events.[9]

V. heard Garcia ask Alderete why he was "chatting with [that lady] in [a] message" and told him not to lie, and he responded, "I don't know what

_____

evasive." On this basis, the court admitted V.'s out-of-court statements as prior inconsistent statements.

[8] V. testified that Garcia was talking to someone who "sounded like a woman." But Garcia testified that she was speaking to a male friend, and I. denied ever speaking to Garcia by phone.

[9] The primary bedroom's door was closed for at least part of the argument between Garcia and Alderete, but the bedroom's window facing the street and the front door were open. At the time, V. wore hearing aids, which were "falling [out] a little" during the incident. V. could hear very clearly with them and "medium" without them.

you're talking about." Garcia then "showed a picture to him." V. heard "something . . . banging really hard in the room," as if someone "was breaking something." V. also saw Garcia hit Alderete, giving him a bloody nose. He came out of the primary bedroom, and when V. asked what happened, he indicated he fell on the floor.

According to V., at some point during the argument Garcia left the primary bedroom and went to the kitchen. Alderete followed her, saying, "Oh my God don't. I'm sorry." V. heard "a little noise" that sounded like a knife knocking against forks, after which her parents returned to their bedroom. V. could see that Garcia was holding a knife, even though Garcia was "kind of hiding" it. When asked for clarification, V. said she was outside when she heard the knife's sound but could see into the kitchen. She said that Garcia kept that specific knife "in the kitchen where the forks are" to "cut . . . tomatoes."[10]

V. also told the police, however, that Garcia "sometimes" kept the same knife hidden "next to the bed" in case "some bad guys come[]." Similarly, at trial, both V. and K. testified that a knife was kept between their parents' bed and the nightstand to defend against intruders. K., who did not see Garcia pick up the knife, testified that she assumed her mother got it from the side of the bed.

After Garcia and Alderete returned to their bedroom, V. heard "someone screaming" but did not know who it was. V. then heard someone say, "Please don't do this to me. I'm sorry." V. knocked on the bedroom's door and asked "[i]f everything was all right," and Garcia said, "Yes. Everything is in order." V. then used the bathroom.

_____

[10] At trial, V. testified that she "wasn't sure" what Garcia was holding and did not in fact see the knife.

V. reported that Garcia later told her what happened next. Garcia explained that she "didn't wanna kill [Alderete]" and "was just . . . holding [the knife] for him to not do nothing to her." Garcia said "she put it down [on] the table," at which point Alderete "grabbed her throat and start[ed] choking her." Garcia said she then "pushed him, got the knife," and "had to . . . put it . . . [i]n [his] chest or something," because "she didn't wanna die."[11] V. indicated that she believed Garcia had indeed been choked because she saw "the red mark on [Garcia's] chin."

K. testified that she did not see the stabbing but did see Garcia drop the knife and hug Alderete. V., however, told the police that as she was exiting the bathroom, a knife came flying down the hallway and "almost hit [her]." Although V. did not see who threw the knife, she thought it was her mother because Garcia apologized to V. for not realizing she was there. When V. asked about the blood that was on the knife, Garcia said it was "just painting."

Both V. and K. saw Alderete emerge from the primary bedroom on his knees, "all bloody" and holding his upper body. V. started "crying really bad" and asked Garcia what happened and whether she "[did] this." Garcia said she did not know. V. was unsure whether Garcia had hurt Alderete or whether he had hurt himself.

Meanwhile, Garcia told V. to press on Alderete's wound and "went outside [and] started screaming for help." Alderete moved toward the trailer's front door on his knees before falling down. When the police asked whether Garcia "ever . . . tr[ied] to help [Alderete] stop his bleeding," V.

_____

[11] Although V. initially did not claim to have witnessed the stabbing, she ultimately told the police that she "saw the part when [Garcia] put the knife in [Alderete]." According to V., Garcia "did it once. She just put it there and she took it out."

responded, "No[,] she didn't actually care. She just [stood] there and started screaming [for help] . . . and she didn't really touch him." As we discuss in more detail in section II.C. below, there was also evidence that immediately after the killing Garcia told V. not to tell the police what happened.

### D. *The Aftermath of the Stabbing*

At 3:17 p.m., Garcia made a missed call to I. on Facebook Messenger. I. then received a message from Garcia that said, "Chinga tu mad[r]e," or "Fuck your mother."[12] At 3:18 p.m., Garcia called 911 and spoke to the dispatcher for about two minutes. During the call, which was played for the jury, Garcia was hysterical to the point that the dispatcher had trouble understanding her. Garcia said there was an "emergency" and pleaded for an ambulance, but she did not explain what had happened except to say, "Christian is dying."

Two of Garcia's neighbors, a man and a woman, heard noise and went to investigate. The male neighbor heard Garcia, who "seemed like she was in distress," while she was on the phone. When he approached to see what was wrong, he observed Garcia standing in the street outside her residence. He then saw Alderete, who was lying on his stomach halfway outside the trailer's front door. Alderete was "gasping for air" and had "blood all down his face." At 3:22 p.m., the neighbor called 911, and he attempted to administer aid to Alderete until the police arrived.

The female neighbor heard "screams for help" and "banging" and went outside, where she also saw Garcia standing in the street. Garcia approached

---

[12] Garcia denied making these communications, claiming that Alderete took her cell phone during the incident and used it. She testified that she had heard Alderete use the phrase "Chinga tu madre" but did not use it herself. The defense also elicited I.'s agreement that the phrase is "a common . . . insult" used by those of Mexican descent, like Alderete was.

9

and asked whether the neighbor could take care of V. and K. Garcia seemed "nervous, like in a panic," but did not appear to have injuries or any blood on her. The neighbor agreed to watch the girls.

At 3:21 p.m., right after her 911 call ended, Garcia phoned her sister in Stockton, a call that lasted about 12 minutes. The sister's husband testified that his wife "seemed very scared" while talking to Garcia, so he took the phone to speak to his sister-in-law. Garcia was "screaming and crying at the same time" and sounded "anguish[ed]." The husband asked Garcia what had happened, and she responded, "I hurt him." The husband assumed she had "an argument or something" with Alderete, since Garcia had previously told both her sister and the husband that Alderete was violent toward her.

During the call, Garcia asked her sister and her sister's husband to come get V. and K. According to the husband, Garcia "sounded like she was more worried about her kids than anything that had happened." The two immediately left Stockton and drove to South San Francisco to retrieve the children, who still lived with them at the time of trial.

Meanwhile, Alderete's father had arrived at his son's trailer to see Alderete on the ground and someone "giving him aid." Alderete's father had hurried over because of a call he received from Garcia. At 3:10 p.m., around when she arrived home, Garcia called Alderete's father twice, the first call lasting 5 seconds and the second call lasting 25 seconds. Alderete's father testified that when he answered the phone, Garcia asked where he was, and he responded that he was at work. Garcia, who "sounded a little bit nervous," responded "okay" and ended the call. Alderete's father was "concerned," as it was unusual for Garcia to call him, and left work immediately.

Sometime after getting to the scene, Alderete's father spoke to Garcia. He testified that "[s]he had tears in her eyes," but he did not observe any

10

"marks or injuries" on her. When he asked what happened, she said, "I don't know. I grabbed something from the kitchen, and I plunged it into [Alderete] because he was strangling me." Alderete's father said that Garcia "was behaving nervously" and indicated "she didn't know what she had grabbed" when he asked "why she had stabbed" Alderete. Alderete's father also testified that toward the end of the conversation Garcia asked "with a smile" whether Alderete had "already die[d]," though he admitted he did not mention this to the police at the time.

### E. The Police Response and the Physical Evidence

#### 1. Evidence at the scene and Alderete's autopsy

Officer Walsh was dispatched to the scene around 3:23 p.m. and was the first officer to arrive at the trailer.[13] Alderete was lying face down, halfway outside the front door onto the landing, with "a large amount of blood" on his clothing and underneath him. The paramedics arrived shortly thereafter, and Alderete was pronounced dead at 3:35 p.m.

A "large kitchen knife" was on the trailer's hallway floor, near the kitchen threshold. There was "blood about halfway up the blade," which was approximately nine inches long. A second kitchen knife, which was roughly the same size but had no blood on it, was found in a closet in the primary bedroom. There was a wooden knife block on the kitchen counter next to the sink, but neither knife appeared to fit into the block.

Other evidence found at the scene included Alderete's wallet and cell phone on a shelf under the kitchen stove and a bloody piece of plastic wrap—which can be used to seal a wound—in the primary bedroom. There were a

---

[13] Video footage from Officer Walsh's body-worn camera, which she activated before arriving, was played for the jury.

few small bloodstains on the side of the lower mattress in that bedroom but no blood on top of the bed.

An autopsy showed that Alderete had an approximately two-inch stab wound to his upper left shoulder, about an inch below his clavicle. He also had "small scratches" on his nose and other minor abrasions on his lip and neck. The stab wound's trajectory was mostly from the upper portion of the body downward and "somewhat" from front to back and from Alderete's left side to his right side. The knife "perforate[d] the chest cavity on [the] left side below the second rib" and "penetrate[d] the upper lobe of the left lung." Alderete's cause of death was primarily blood loss from the stab wound, which severed his axillary vein, with the lung injury as a contributing factor.

The prosecution forensic pathologist testified that the precise depth of Alderete's stab wound could not be determined, but it was caused by a single-edged knife that was several inches long. The defense forensic pathologist testified that the wound was six to seven inches deep. Since the knife appeared sharp in the crime-scene photographs and did not "hit[] any bone or cartilage," the defense pathologist opined that only "a moderate amount of force" was needed to inflict the wound. Both pathologists agreed that the knife entered Alderete's body with its "sharp cutting edge . . . upward" and its "non-cutting portion . . . downward." In other words, if Alderete was stabbed from the front in a downward motion, then the knife was held upside down, "opposite from what [one] might expect."

The prosecution pathologist opined that "[s]ingle stab wound homicides are a little bit unusual." He noted that single stab wounds to the neck region, like the one Alderete sustained, could kill because of the major blood vessels in that area. The defense pathologist testified that the knife entered between

12

Alderete's second and third ribs "by chance," and if it had been angled differently it might have hit a rib.

        2.     Garcia's physical and emotional state

Around 3:30 p.m., Officer Stephanie Tenorio, a native Spanish speaker and certified translator, interviewed Garcia at the scene. The interview was recorded on Officer Tenorio's body-worn camera and played for the jury. When Officer Tenorio initially contacted Garcia, Garcia was still talking to her sister, but she hung up at the officer's request. Garcia cried throughout the interaction.

After mentioning prior domestic violence by Alderete, Garcia told Officer Tenorio that "he was strangling [her]" and placed one hand around the front of her neck. Alderete also said he was "going to kill [her]." Garcia continued, "[H]e was strangling me, and I grabbed something and I just went like this to him because, I didn't . . . know what I did, but . . . it was in self-defense." To demonstrate how she "went like this," Garcia bent her elbow to raise her fist over her shoulder before quickly bringing her fist down in front of her in a chopping motion. Garcia also stated that she "scratched [Alderete] because he wanted to insult [her]."

Officer Tenorio asked what Garcia hit Alderete with, and Garcia responded, "I don't know, I don't know what, I just swung at him, I grabbed, I did like this to him." Garcia made the same chopping motion to demonstrate. The officer then asked how Alderete received the wound he had, and Garcia responded, "I grabbed something from the table, and I went like this to him. [¶] . . . [¶] I don't know what it was." To demonstrate, Garcia again made the chopping motion.

Officer Tenorio asked Garcia whether she needed medical treatment. Garcia responded that she did not have any cuts but had "been hit." At trial,

Officer Tenorio testified that she did not see any injuries on Garcia "that stood out." Nor did the officer notice any "signs of strangulation," such as complaints of pain or a "raspy" voice.

Garcia's hands were photographed at the scene. There was a fair amount of dried blood on her right palm and wrist, and "a little bit of dried blood on [her] left palm" and near her right thumb. Garcia was still wearing her work uniform, and there was no visible blood on her clothing except for "one drop" on the front of her shirt.

Garcia was also wearing a gaiter around her neck.[14] Officer Tenorio agreed that a photograph of Garcia taken at the scene showed her face was red, and "there [was] some redness around the area above the scarf." But the redness in Garcia's neck and face was uniform, and she had been "crying practically the majority of the time."

After speaking to Garcia, Officer Tenorio transported her to the police department. The officer "watch[ed] her until the detectives were ready to interview her," and during this period Garcia "constantly kept crying." Garcia asked about Alderete, whom she was not yet aware had died, and prayed for him.

Around 5:30 p.m., while Garcia was still waiting to be interrogated, Officer Tenorio took more photographs of her, including of her neck. There were no observable injuries to Garcia's neck or face. Officer Tenorio also took DNA swabs from various parts of Garcia's body, and later testing revealed

---

[14] Garcia testified that she wore the gaiter, which the police "inadvertently" did not book into evidence, "to cover the bruises that [Alderete] would leave on [her] or sometimes because it was very cold outside." Garcia's friend and former coworker testified that she sometimes saw bruising on Garcia's arms and confirmed that Garcia often wore a gaiter to work.

that Alderete's DNA was on Garcia's neck.  A criminalist who testified for the prosecution agreed on cross-examination that "one reasonable explanation" for this DNA's presence was that Alderete touched Garcia's neck on the day in question.

After Garcia was interrogated as detailed below, another police officer took her to the hospital for further examination as a potential strangulation victim.  That officer testified that Garcia "was calm" and her voice was "clear."  During intake, Garcia indicated she was not in pain, and the officer did not observe any injuries to her face or neck.  But once Garcia was wearing a hospital gown, the officer noticed a red mark on Garcia's "collar area."

The nurse practitioner (NP) who examined Garcia testified that symptoms of strangulation include changes to the voice, difficulty swallowing, difficulty moving the neck, and petechiae (tiny red dots) on the eyes, the face, or the roof of the mouth.  Another obvious sign of strangulation is trauma to the neck, such as swelling or bruising.  Redness on the neck might be, but is not always, present after a person is strangled.  The NP testified that swelling and bruising are often not present when examining a strangulation victim, because both "take[] time to develop" and "a lot of the swelling can be internal."  A subject's report of losing consciousness or "completely forgetting what happened" is also significant, as it might indicate there was "less oxygen to the brain."

During the examination, the NP took several photographs of Garcia.  As reflected by these photographs, which were introduced into evidence, the NP did not observe any injuries to Garcia's eyes, the roof of her mouth, or her neck.  Toward the end of the examination, the NP noticed "a red spot" on Garcia's neck and took additional photographs of it, which show a red mark about an inch long on the lower front of her neck.  The NP testified that if

15

strangulation from several hours before caused the redness, "the redness should have been there to begin with during the exam."

The NP also testified about the information Garcia provided, as reflected in the NP's examination report. When asked to describe the strangulation event, Garcia said that Alderete choked her from the front for approximately two minutes. She indicated that she was "gasping" and "felt like [she] was losing all [her] air." Garcia reported "lapses in her memory during the entire incident" but no loss of consciousness. She also reported coughing immediately after the incident and "uncontrolled shaking" that lasted for about two hours. Finally, she experienced more persistent throat and neck pain and "blurry" vision.

Two days after the killing, the police took more photographs of Garcia "to see if any visible injuries" like bruising had developed. Garcia indicated that she did not have injuries but that "her head hurt because [Alderete] had pulled her by the hair." The photographs, which were introduced into evidence, confirm there were no visible injuries or bruising on Garcia's neck or face.

A registered nurse (RN) testified for the defense based on her review of the NP's examination report and the police reports. The RN explained that strangulation occurs when "enough pressure" is applied to someone's neck "for a long enough time that the brain is de[p]rived of oxygen," which is known as hypoxia. Hypoxia can cause symptoms ranging from "headaches [and] dizziness . . . to vision changes and loss of consciousness, seizures." There may also be "lapses in memory from hypoxia due to the brain cells malfunctioning." The RN opined that there was "evidence . . . [Garcia] was strangled" because she reported and displayed symptoms of hypoxia, including her lapses in memory during her interrogation.

16

The RN testified that signs of hypoxia are more important than visible trauma to the neck when determining whether someone has been strangled. She indicated it is "a common misconception" that there must be bruising to the neck "to prove that strangulation occurred." In fact, "between 15 and 85 percent of victims of strangulation will have . . . no marks on their neck or any bruises or anything along those lines." The potential for visible injury could be further reduced if the victim was wearing a scarf. Petechiae are not always present in strangulation cases either, because they occur only "when the jugular vein is occluded and the carotid artery is open, and that has to be sustained for about 20 to 30 seconds."

### F.    Garcia's Interrogation

#### 1.    The interrogation's circumstances and gap in recording[15]

The interrogation lasted for about two hours and 45 minutes, from around 9:45 p.m. to 12:30 a.m. Then-Detective Daniel Brown, the lead investigator, and Sergeant Sean Curmi, his supervisor, conducted the interrogation, and Officer Tenorio translated. Detective Brown's and Officer Tenorio's body-worn cameras were activated, and the station's in-house camera system, Milestone, was also recording. A deputy district attorney in another room at the station watched the entire interrogation through a livestream of the Milestone footage.

In the middle of the interrogation, Detective Brown and Officer Tenorio noticed their body-worn cameras had stopped recording. The officers reactivated their cameras around 11:15 p.m. It was later discovered that

---

[15] This section describes evidence introduced as trial. As discussed further in section II.B., significant evidence about the gap was also presented at the hearing on Garcia's *Trombetta/Youngblood* motion. We recount in detail circumstances related to the gap because they affect our consideration of the trial court's ruling on that motion.

both cameras shut off one hour and 16 minutes after being activated, around 11:00 p.m. Detective Brown's camera subsequently shut off again, a few minutes before the interrogation stopped, but Officer Tenorio's recording lasted until the end of the interrogation.

In addition, the Milestone footage had several gaps in it. The room camera began recording a few minutes before the interrogation started but stopped less than 20 minutes later. It did not resume recording again until about 90 minutes later, with an hour left in the interrogation. Half an hour after the recording resumed, it stopped again for about 10 minutes. Finally, the recording stopped again with about five minutes left in the interrogation and did not capture any more of it. The district attorney testified that the live footage never stopped, so none of these malfunctions were apparent to her at the time.

The pauses in the recordings resulted in a gap of approximately 13 minutes that none of the three cameras recorded. After this issue came to light, it was reported to Lieutenant Keith Wall, the administrator of the body-worn cameras program. He testified that those cameras have "a 60-second prerecord," meaning that after an officer activates a camera, "the system will automatically record 60 seconds of video only with no audio." At the time of Garcia's interrogation, the cameras were administratively set to shut off one hour and 15 minutes after the prerecord period ended, meaning a recording that stopped automatically should be one hour and 16 minutes long.[16] Lieutenant Wall contacted WatchGuard, the company that provided the body-worn cameras, and learned it would be impossible to retrieve the

---

[16] The police department's policy manual, however, indicated that the shut-off time was two hours. As a result of this case, the shut-off time was eventually changed to two hours.

18

lost footage. He also contacted the police department's IT division and Milestone's customer support to attempt to retrieve the missing Milestone footage, but it likewise was never recovered.

The law enforcement officials who testified about the 13-minute gap were all concerned about it, particularly because the problem occurred during the interrogation of a murder suspect. The district attorney testified that she and Detective Brown were "mortified" about the gap, which was "the last thing in the world" one would want to happen during such an interrogation.

Before the 13-minute gap started, Garcia was talking about I.'s communications with her. When the recording resumed, Garcia was discussing confronting Alderete about his infidelity. In line with this, Detective Brown testified that the missing portion of the interrogation concerned Alderete's infidelity and I.

Garcia testified that she was threatened during the interrogation, which did not happen in the recorded portion. According to Garcia, "in the middle of the interview," Sergeant Curmi said her story was untrue and the police "needed to hear a story that they wanted to hear. [¶] . . . [¶] . . . And . . . that [she] really had to tell that story [or else she] would go to prison and [her] daughters would be taken away." Garcia claimed that Officer Tenorio and Detective Brown were "surprised" when Sergeant Curmi said this. In rebuttal, Officer Tenorio and the district attorney denied that Sergeant Curmi threatened or intimidated Garcia in any way, such as by saying her daughters would be taken away. Both women testified that they would have intervened if any threats had been made.

   2. Garcia's statements during the interrogation

The recorded portion of the interrogation was played for the jury. Garcia was upset throughout, crying on and off, and repeatedly indicated she

was having trouble remembering what happened.  As set forth below, she described two general scenarios for the killing:  one in which she stabbed Alderete in the kitchen with a knife she picked up in that room, and one in which she stabbed him in the primary bedroom with a knife she grabbed from next to the bed.  Garcia never affirmatively described the scenario the prosecution pursued at trial, that she took the knife from the kitchen before returning to the bedroom and stabbing Alderete.

Garcia told the police that on the morning of the killing, Alderete left for work after "he kissed [her], hugged [her], and . . . told [her] he was happy to be with [her]."  He also asked her "to forgive him for all the bad things he had done to [her] before."  Garcia responded that he "ha[d] until December to change" or she would leave him.

That afternoon, Garcia drove V. and K. home from school and told them to play outside while she made food for them.  During the drive, she talked on the phone with a male friend about "a very toxic relationship" her friend had just left.  When asked about her and the girls' mood on the ride home, she said everything was "fine."  Garcia also initially denied anything had "happen[ed] that . . . made [her] upset with" Alderete.  But when confronted with V.'s statement that she had "an angry look on her face" during the ride, Garcia explained that while she was at work she saw the old Facebook messages from I.  The two women began messaging, and I. disclosed that she had a sexual relationship with Alderete.

*The first scenario*

Garcia initially said that when she entered the trailer, Alderete, who was sleeping on the primary bedroom's floor, woke up.  He immediately asked her whether she had opened Facebook, saying, "I already told you that you shouldn't be communicating with any men."  Garcia explained that Alderete

20

got notifications of "everything" she did on her cell phone, including opening Facebook.

Garcia told Alderete to "[c]alm down" and said they could talk after she made food for the girls. Alderete said, "No, no," and slapped her face. She got angry and "pushed him," asking what was wrong with him and saying she would not allow him to keep mistreating her. Alderete then grabbed Garcia by her neck with both hands, and she felt like she could not breathe. She "hit[] him on the face" and "scratched him" in an attempt to "defend [her]self." Although he was "incredibly strong," she managed to kick him in the stomach and "shove" him backward into a dresser.

After pushing Alderete away, Garcia "ran to the kitchen" and "grabbed a knife" from a "table" next to where she put dishes to dry. Alderete had followed her, and she told him, "[D]on't be hurting me. . . . I have a knife and you can't get closer." Alderete responded, "I don't care," and he grabbed Garcia's neck with one hand and her hand holding the knife with his other hand. Garcia felt she "couldn't breathe any[]more" and was gasping for air. After demonstrating the same chopping motion she demonstrated to Officer Tenorio at the scene, she indicated that she "thought [she] had hit" Alderete in the shoulder area.

Garcia reported that after stabbing Alderete, she threw the knife on the floor and ran out of the kitchen. Having seen blood on him, she went outside to call the police, but she was too upset to make herself understood. Some neighbors approached, and she asked them for help. Garcia then called her sister to ask her to pick up V. and K. Garcia told her sister that she did not know whether Alderete was "alive or dead," but she thought he was "going to kill [her]" because "he would always tell [her], 'I prefer to see you dead than

with another man.' " Garcia told her sister that she "just [did] something that's not right" but "it was [her] life . . . or his."

The police told Garcia they did not believe her, and Sergeant Curmi said that since she was "having a hard time starting with the truth," he would tell her what he thought happened and she could "say yes or no." Sergeant Curmi then said, "[You] went to the kitchen," "[g]rabbed a knife," "[w]ent back in the bedroom," and "continued arguing with [Alderete]." Garcia responded, "Correct," and asked to "start over again" and "[t]ell the truth." But she then told a story in which she killed Alderete in the primary bedroom, and in doing so consistently claimed she got the knife from next to the bed, not the kitchen.

*The second scenario*

Garcia admitted that she initiated the confrontation upon first entering the trailer by asking Alderete about I. In this version, when Garcia arrived home, she was "really upset" and hit Alderete's foot to wake him. She asked who I. was and why he cheated, but he denied knowing I. Garcia grabbed his cell phone and threw it outside.[17] She then "hit him in the face," causing his nose to bleed, and he "slapped" her on the cheek.

Garcia began crying and ran to V. and K.'s bedroom. Alderete followed her and admitted he went out with I. a few times but denied they had a sexual relationship. Garcia "hit him in the chest" and said she did not believe him. Angry, Alderete said he was "leaving the house" and returned to the primary bedroom.

---

[17] The fact that Alderete's cell phone was later found under the stove contradicted this statement. At trial, Garcia testified that she did not throw his phone even though she told the police otherwise.

22

Garcia followed Alderete and asked him to explain himself.  At first, she claimed he indicated what he was doing was wrong and apologized, and she told him she "didn't want to be with him any[]more."  He then grabbed her hand, led her to the front door, and told her to leave.  Later in the interrogation, however, she claimed that once the two returned to their bedroom, Alderete did not admit wrongdoing but instead insisted he did not do anything "serious" with I.  Garcia did not believe him, and she opened Facebook on her cell phone to show him I.'s messages.  Garcia then "hit him again in the face."

Alderete grabbed Garcia by the neck, and she could not breathe.  She picked up a knife he kept by the bed and "stabbed" him, although she did not "even know where" on his body she did so.  Initially, when asked how she reached the knife, Garcia said Alderete pushed her and she "fell on the floor." She grabbed the knife and stood up, and it was then that he started choking her and she stabbed him.  After stabbing Alderete, she flung the knife away but did not "know where . . . [it] ended up."  In particular, Garcia implicitly denied apologizing to V. for almost hitting her with the knife by claiming that both girls were outside "the entire time."

Garcia then described a version of events in which she was lying half on and half off the bed, not on the floor, after Alderete grabbed her by the neck.  He stood over her, pressing down on her neck and choking her. With her left hand, she "managed to grab the knife" that was kept on the ground between the bed and the bedside table.  She then switched the knife to her right hand.  Feeling like she "was running out of air," Garcia "hit" Alderete

with the knife.[18]  V. "came in" and "started screaming," at which point Garcia realized Alderete was bleeding and went outside to seek help.

The police confronted Garcia with the relative lack of blood on her shirt or on the bed, which was inconsistent with her claim that she stabbed Alderete when he was standing over her.  She then stated that after she grabbed the knife, Alderete "saw [it] and stood up," letting her go.  She also stood.  It was at that point, while he was no longer choking her, that Garcia passed the knife from her left hand to her right hand and stabbed him.  Garcia said, "I didn't . . . know what I did and I just put it in."

The police also confronted Garcia with the fact that V. reported seeing her "walk to the kitchen, grab a knife[,] and walk back to the [bed]room" carrying it.  Garcia responded that she did not remember and said, "I don't know.  It could possibly be."  But she then repeatedly denied taking a knife from the kitchen, saying that although she was having trouble remembering things, she was sure she took the knife from the floor next to the bed.

Finally, Garcia explained that she had told multiple versions of the story because even though she acted in self-defense, she was scared of getting in trouble and losing her daughters.  She indicated that "she had made a mistake" and wished she had left the house instead of stabbing Alderete.  But she asserted that the version of the story where she grabbed the knife from the floor next to the bed, she and Alderete both stood up, and then she stabbed him was the truth.

At the end of the interrogation, Garcia asked how Alderete was and was informed he was dead.  Garcia began crying and said, "[W]e would fight a

---

[18] Garcia agreed with Sergeant Curmi's suggestion that she stabbed Alderete because "she was still angry."  But when asked directly whether she stabbed Alderete out of anger, she said, "I don't know, but I did it."

lot, but I really did love him. [¶] . . . [E]ven though you don't believe me, I feel really bad about that."

G.     *Garcia's Trial Testimony*

Garcia's trial testimony generally accorded with the last version of events Garcia described during her interrogation, although she added several details not previously mentioned. She testified that when she arrived home on the afternoon in question, she was angry with Alderete because of her communications with I. but did not intend to kill him. She went into the primary bedroom and "kicked [his] foot in order to wake him up." Showing him her cell phone, she asked him to explain the messages from I. Alderete denied knowing who I. was, and Garcia "told him not to pretend." He began laughing, and Garcia slapped him in the face.

According to Garcia, Alderete then grabbed her by the hair and neck and said, "What are you complaining about? All women are whores." Garcia struggled with him, "scratching him in order to get him to let [her] go, and [she] lifted [her] knee and hit him in the stomach." After Alderete grabbed her cell phone and threw it, Garcia testified that she freed herself and "ran off . . . to get [the] phone in order to call his parents."

Garcia testified that she found her cell phone in the hallway, picked it up, and went to V. and K.'s bedroom to call Alderete's father. He did not initially answer the phone, but after she called back they spoke briefly. She remembered asking him to come over "because his son had gotten really violent." Alderete then took her phone away and used it to text and call someone, the implication being it was I.

Garcia told Alderete their relationship was over and she was leaving, and "[h]e tried to hit [her] again." She then stepped into the kitchen, grabbed a comal, which is used to heat tortillas, and threatened to hit him with it

25

while demanding he return her cell phone. Alderete gave her the phone but grabbed the comal from her hands.

Garcia testified that she ran toward the primary bedroom, intending to get her car keys and leave. Alderete followed her into the bedroom and said, "[Y]ou cannot leave because you are mine. And if you're not mine, you're not going to be anybody else's. Understand that." Garcia responded that she wanted nothing more to do with him.

Alderete then "threw [Garcia] down between the bed and the rug," so that her "back was on top of the bed," and began choking her with both hands. Garcia testified that it was hard to breathe, her "vision got cloudy," and she "started to just see black." She tried to yell, "but no words were coming out," and she could not "get [Alderete] off from [her]."

Garcia "felt so scared" and "thought [she] was going to die right then." She remembered the knife Alderete kept next to the bed and grabbed it with her left hand.[19] When he saw the knife, he stood up, letting go of her. Still unable to see clearly, Garcia switched the knife to her right hand and also stood. Alderete "lung[ed]" at her, and she raised her right hand above her head and swung it downward.

Garcia testified that when she swung the knife, she did not intend to kill Alderete. Indeed, she denied knowing "where [she] was hitting with the knife at that point or even if [she] had hit anything." After the single strike, her vision cleared, and she saw Alderete bleeding heavily from his left shoulder. She then "looked over and saw the knife in [her] hand." Feeling

---

[19] Garcia testified that the doors to the trailer did not close properly, so for safety, Alderete kept a knife between the bed and the nightstand on his side of the bed, and she kept a knife in their closet.

"scared," she flung the knife away, and she "grabbed something" and used it to apply pressure to Alderete's wound.

Alderete fell to his knees. Garcia saw V., who had apparently entered the trailer, and directed her to press on the wound.[20] Garcia then ran outside, yelling for help, and called 911 on her cell phone.

At trial, Garcia admitted initially lying during her interrogation and explained she did so because (1) she "was afraid that [she] might be accused of something that only happened in self-defense"; (2) she was afraid that if Alderete, whose death she was not yet aware of, found out she told the truth he might harm her; and (3) she "was getting confused by the police about things that [she] could not remember exactly." She also testified that after Sergeant Curmi threatened her with going to prison and losing her daughters, she "didn't know what they wanted to hear."

### H.    Evidence of Prior Violence Between Garcia and Alderete

Alderete had only two serious relationships with women during his life, one with Garcia and the other with a previous girlfriend. The previous girlfriend, who dated and lived with Alderete for about three years in the mid-2000's, testified that he was "a very sweet person" and "[n]ever" violent. I. and Alderete's sister also testified that he was not a violent person, and the sister never saw any violence between him and either the previous girlfriend or Garcia.

But according to Garcia, Alderete was verbally and physically abusive toward her. She told the police that he "used to drink every day" and would "become[] very aggressive" when he drank. A particular problem was his jealousy. About a month after Garcia moved in with Alderete, he put controls

---

[20] Garcia denied having "any discussion with [V.] about the knife" at this point.

on her cell phone so he could track her movements and online activities. If she was late, he would call her and ask whether she was with another man, and he called her a "whore" when she spoke to male friends on the phone. At trial, Garcia testified that Alderete sometimes had her take her clothes off so he could inspect her body, including her "private parts," for evidence she had been with other men.

In mid-2015, about four months into their relationship, Alderete raised his hand to Garcia for the first time. Around the same time, he started drinking more heavily, which made him more "aggressive." Over the following years, he was physically violent toward Garcia 20 to 30 times, including grabbing her by the hair, kicking her, and punching her. A few times, he choked her. "[M]any" of these violent incidents occurred in front of V. and K. During her interrogation, Garcia said she was reluctant to report Alderete's violence to the police because she "needed to pay [for] a lot of things and . . . he help[ed her]." At trial, she testified that she did not leave him "[b]ecause [she] had a home for [her] daughters, and [she] honestly didn't know what to do. And also, because [she] loved him."

Evidence of three particular incidents of prior violence was introduced at trial. Garcia testified that in March 2019, during an argument, Alderete "grabbed [her] by the neck," "threw [her] on the bed," and "was pressing on [her] neck really hard." According to Garcia, K. "threw herself on top of [Alderete]" and begged him to stop, at which point he let Garcia go and told V. and K. "that he was just playing." Similarly, K. testified that she once saw Alderete choking Garcia in the primary bedroom. He told K. that he and Garcia were "just playing," but K. did not believe him.

Garcia testified that as soon as Alderete released her, she ran outside with her daughters, and he chased after them with a knife. V. testified that

28

she asked Alderete why he had a knife, and "[h]e said he was going to pop the tires." Garcia and the girls then ran to Alderete's parents' residence for help.

Garcia testified that after she told Alderete's parents what happened, Alderete's father went to talk to Alderete. Alderete then came to his parents' home and "asked [Garcia] to forgive him in front of his parents and [her] daughters." At trial, Alderete's father agreed there was "an incident in March of 2019" during which Garcia arrived at his residence with her daughters and he "confronted" Alderete, after which Alderete apologized to Garcia in his presence.

Garcia also described an April 2019 incident. She was taking a bath when Alderete pulled her by her hair out of the tub and onto the floor. He then punched her legs and arms and kicked her. Garcia was "really scared" and called the police. Corroborating this, V. testified that she once heard noises coming from the bathroom while both her parents were in there, and Garcia then emerged and called the police.

According to Garcia, after she called the police, Alderete asked her not to report him if she "truly loved him." She called the police again and asked them not to come. Nonetheless, some officers arrived at the trailer, and Garcia talked to them while Alderete took the girls to "hide" in the primary bedroom. V. and K. both remembered the police coming to the trailer, and K. testified that Alderete told them to "stay in the room and stay quiet."

Garcia told the police she fell in the bathtub and "nothing had actually happened" between her and Alderete. One of the officers who responded testified that he did not observe any injuries on Garcia and left without arresting Alderete because Garcia did not want to press charges.

Finally, Garcia testified that in September 2019, the month before the killing, Alderete grabbed her neck and choked her. About a week later, he

29

was inspecting her body and noticed some bruising on her neck. He told her it was a hickey, but she responded that "it was the result of what he had done to [her] several days before." A photograph of a large bruise on the back of her neck, which Garcia claimed Alderete took at the time, was introduced into evidence.

V. told the police that her parents argued "[a] lot" about each having friends of the opposite sex. She said Garcia sometimes hit Alderete, but Alderete "did it only once to [Garcia's] arm," and Alderete was "scared of [Garcia] now 'cause she's really stronger than [he is]." V. also said Alderete "[got] mad really easily."

During her interrogation, Garcia admitted she sometimes hit Alderete after he attacked her, because when he was drunk "he would get very aggressive and [she] had to defend [her]self from him." But she denied ever hitting him out of anger. At trial, the prosecution introduced text messages between Garcia and Alderete from about four months before the killing in which she appeared to admit hitting him and apologized. When Alderete suggested they end their relationship, Garcia responded, "I swear to my god that I did not do it with bad intentions."

I.      *Procedural History*

Garcia was charged with two felony counts, murder and dissuading a witness from prosecuting a crime. It was also alleged that she personally used a deadly and dangerous weapon, a knife, during the murder.[21] Before trial, the trial court denied her *Trombetta/Youngblood* motion to exclude the portion of her interrogation following the 13-minute gap, a ruling forming the

---

[21] The charges were brought under sections 187, subdivision (a) (murder), and 136.1, subdivision (b)(2) (witness dissuasion), and the weapon enhancement was alleged under section 12022, subdivision (b)(1).

basis for her second claim on appeal. After holding an in camera hearing, the court also denied her *Pitchess* motion for disclosure of Officer Walsh's personnel records, a ruling forming the basis for Garcia's last claim on appeal.

As to the murder charge, the jury was instructed on first and second degree murder, perfect self-defense, voluntary manslaughter based on imperfect self-defense and heat of passion, and involuntary manslaughter. The trial court's response to a jury question about the knowledge element of implied malice is the basis for Garcia's first claim on appeal. As to the remaining charge, the jury was instructed on the elements of dissuading a witness from reporting a crime, not dissuading a witness from prosecuting a crime, which forms the basis of her third claim on appeal.

The jury convicted Garcia of second degree murder and dissuading a witness from reporting a crime and found true the weapon enhancement. In March 2022, the trial court sentenced her to 16 years to life in prison, composed of a term of 15 years to life for murder, a consecutive term of one year for the weapon enhancement, and a concurrent term of two years, the midterm, for dissuading a witness.

II.

DISCUSSION

A. *Instructional Error Requires Reversal of the Murder Conviction.*

Garcia contends the trial court incorrectly answered a jury question about the knowledge element of implied malice. We agree and conclude the error was prejudicial.

1. Additional facts

The jury was instructed on first or second degree murder with malice aforethought under former CALCRIM No. 520. The instruction provided that Garcia "had implied malice if, one, she intentionally committed the act [that

31

caused the death of another person]; two, the natural and probable consequences of the act were dangerous to human life; three, at the time she acted, she knew her act was dangerous to human life; and, four, she deliberately acted with a conscious disregard for human life."[22]  The instruction also provided that "[a]n act causes death if the act is the direct, natural and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence."

The jury was also instructed on the union of act and intent under CALCRIM No. 252 in relevant part as follows:  "The crimes and allegations charged in this case require proof of the union or joint operation of act and wrongful intent. [¶] . . . [¶] The following crimes require a specific intent or mental state:  Murder, first or second degree, and witness dissuasion.  For you to find a person guilty of these crimes, that person must not only intentionally commit the prohibited act but must do so with a specific intent or mental state.  The act and the specific intent or mental state required are explained in the instruction for that crime."

During deliberations, the jury sent the following note to the trial court:  "Could we get clarity on #3 of implied malice.  520. '3.  At the time she acted, she knew her act was dangerous to human life[.]'  Does this mean at the <u>exact</u> moment she stabbed him did she know or did she know it was dangerous <u>at</u>

---

[22] After trial in this matter, CALCRIM No. 520 was amended to provide that an act's natural and probable consequences were dangerous to human life if the act "involved a high degree of probability that it would result in death."  (See *People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).)  Garcia's claim does not involve this change to the form instruction.

any time prior to stabbing him?"  After an unreported discussion with the parties, the court responded, "It does not mean only the exact time of the stabbing but includes the period of time from when she decides to arm herself with a knife until the victim is stabbed."

As later memorialized for the record, the defense objected that "the jury should [have been] referred to [the instruction on the] union of act and intent" without further explanation.  Garcia's trial counsel argued that the trial court was incorrectly "taking [it] back to the time of the arming," but Garcia could have lawfully armed herself in self-defense even if "she acted inappropriately or illegally" afterward.  Counsel believed the court was "inviting the jury to violate the union of act and intent [requirement] for implied malice" by permitting the jury to consider if Garcia knew "something [was] inherently dangerous . . . during a protected time" when she was preparing to defend herself.  Thus, according to counsel, even if a juror believed Garcia "acted in imperfect self-defense, but she thought it was [an] . . . inherently dangerous act," the court's response could allow the conclusion that she acted with implied malice.

The prosecutor argued that the trial court's response was "completely consistent" with CALCRIM No. 520, which provides that malice aforethought is " 'a mental state that must be formed before the act is committed,' " and case law recognizing "the importance of the attendant circumstances of the act" in evaluating implied malice.  The response also "did not foreclose" the jury from considering the union of act and intent at the moment Alderete was stabbed.  Thus, in the prosecutor's view, "all the court's response did was to direct [jurors] to [consider the] union of act and intent but also . . . to consider the attending circumstances."

33

The trial court thought its initial response "was an accurate illustration" that tried "to interweave [the law of implied malice] with the facts of this case," and nothing in the jury's question suggested the jurors were "in any way dispensing with an analysis of self-defense." Nonetheless, after further discussion off the record, the court sent the jury the following note: "The court wants to augment the response given to [the] inquiry [about implied malice]. Implied malice has both a mental component and a physical component. The mental component can be proven by the circumstances leading to the deadly result. It is up to you to decide the importance of these circumstances as they evolved." Garcia's trial counsel stated that the augmentation "help[ed]," but the defense's position remained "that it would have been best to simply refer the jury to [the instruction on the] union of act and intent."

### 2. Analysis

A trial court has the duty to " 'instruct[] the jury on all the general principles of law raised by the evidence which are necessary for the jury's proper understanding of the case.' " (*People v. Ramirez* (2021) 10 Cal.5th 983, 1035.) Upon the jury's request during deliberations, the court must also provide the jury with information "on any point of law arising in the case." (§ 1138; *People v. Smithey* (1999) 20 Cal.4th 936, 985.) Thus, the court has "a general obligation to 'clear up any instructional confusion expressed by the jury.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 802; *People v. Ross* (2007) 155 Cal.App.4th 1033, 1047.) "[T]he court has discretion . . . to determine what additional explanations are sufficient" when "the original instructions are themselves full and complete" (*Dykes*, at p. 802), but any further explanation given must be legally correct. (See *People v. Doane* (2021)

34

66 Cal.App.5th 965, 980 (*Doane*); *People v. Fleming* (2018) 27 Cal.App.5th 754, 765–766.)

We review de novo the correctness of a supplemental instruction given in response to a jury's question. (*Doane, supra,* 66 Cal.App.5th at p. 980.) "In determining whether the trial court correctly instructed the jury, 'the question is whether there is a "reasonable likelihood" that the jury understood the charge as the defendant asserts. [Citations.] "In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly." ' " (*Id.* at pp. 980–981.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice may be either express or implied. (§ 188, subd. (a); *People v. Gonzalez* (2012) 54 Cal.4th 643, 653.) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature"—i.e., when the person intends to kill unlawfully. (§ 188, subd. (a)(1); *Gonzalez,* at p. 653.) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) A person who acts with implied malice is guilty of second degree murder. (*Gonzalez,* at p. 653.)

Implied malice is established "when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that [the person's] conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra,* 14 Cal.5th at p. 988.) The knowledge element of implied malice is subjective, requiring the defendant's actual awareness that

35

the act was dangerous to human life. (*Id.* at pp. 988, 992; *People v. Knoller* (2007) 41 Cal.4th 139, 143, 157.) This element may be proven by evidence of circumstances both leading up to and after the fatal act. (*People v. Cravens* (2012) 53 Cal.4th 500, 511; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 107; *People v. Palomar* (2020) 44 Cal.App.5th 969, 977–978.)

Initially, we observe the jury's question was premised on its belief that the relevant criminal act was the stabbing, not the arming. To be sure, "there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death." (*People v. Sanchez* (2001) 26 Cal.4th 834, 846.) Thus, the jury was not necessarily confined to considering Garcia's mental state when she stabbed Alderete, as opposed to during any of her other acts that may have been a proximate cause of his death. (See *Reyes*, *supra*, 14 Cal.5th at p. 988; *People v. Nieto Benitez*, *supra*, 4 Cal.4th at pp. 105–106.) But even if the jury *could* have focused on the arming as the relevant act, its question addressed the timing of Garcia's knowledge in relation to the stabbing. The only reason the jury would ask whether Garcia had to know her act was dangerous to human life "at the exact moment she stabbed him" was if it was wrestling with whether she acted with malice during *that* act. (Emphasis omitted.)

Thus, we interpret the jury's question to be whether Garcia had to know the stabbing was dangerous to human life "at the exact moment she stabbed" Alderete or "at any time prior to stabbing him." The answer is the former. "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." (§ 20; *People v. Fontenot* (2019) 8 Cal.5th 57, 68; *People v. Alvarez* (1996) 14 Cal.4th 155, 220.) Thus, as the jury was properly instructed under CALCRIM No. 520, Garcia acted

with implied malice if "*at the time* she acted, she knew her act was dangerous to human life." (Italics added.)

There is a reasonable likelihood the jury understood the trial court's answer to its question in a way that violated this principle. The court's initial answer can be readily interpreted as incorrectly informing the jury that Garcia did not need the requisite knowledge exactly when she stabbed Alderete so long as she had it at some point during "the period of time from when she decide[d] to arm herself with a knife until [he was] stabbed." The court's supplemental answer did not correct the error. Although the supplemental answer accurately stated that "[t]he mental component [of implied malice] can be proven by the circumstances leading to the deadly result," this addressed only the proof, not the timing, of that component. Even though the circumstances as a whole, including those before the criminal act, are often relevant to proving implied malice, the defendant still must be aware that the act was dangerous to human life *at the time* the defendant performed it. The court's answer informed the jury otherwise.

In arguing that no error occurred, the Attorney General does not explain how the trial court's initial answer could be interpreted as consistent with the union of act and intent. While we agree that telling the jury "it could consider events leading up to the time the stabbing took place" did not convey that the jury "need not find that [Garcia] had to act with malice at the time she stabbed Alderete" (italics omitted), the fact that earlier circumstances can be proof of the required mind state does not clarify the necessary timing of that mind state. The court's initial answer, which *did* address the timing of Garcia's knowledge, conveyed that the phrase "at the time she acted" in the instruction on implied malice meant a longer period than "the exact moment she stabbed him." (Emphasis omitted.) This was

37

legally incorrect to the extent it permitted the jury to convict Garcia of implied malice murder even if it found that she did not know her act was dangerous to human life at the time she stabbed Alderete.

The Attorney General argues that the trial court's answer did not mislead the jury in light of the instructions as a whole, particularly "CALCRIM No. 520's clear statement of the requirement" that Garcia knew of the danger to human life "at the time" she acted. We are not persuaded. The argument relies on the general presumption that jurors are intelligent people able to understand and properly apply instructions. (*People v. Merriman* (2014) 60 Cal.4th 1, 48–49; *People v. Carey* (2007) 41 Cal.4th 109, 130.) But this general presumption can be rebutted, and it was rebutted here because "the jury's question signaled that it did *not* understand a key rule on which it had already been instructed." (*Doane, supra*, 66 Cal.App.5th at p. 983; see *Merriman*, at pp. 48–49.) The court's answer not only failed to clarify the rule but also conveyed the wrong rule.

We therefore turn to whether the instructional error was prejudicial. Initially, the parties disagree on the applicable standard. Garcia claims the error lessened the prosecution's burden of proof, requiring review as a federal constitutional error under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). The Attorney General responds that any error did not reduce the burden of proof and should be reviewed as a state-law error under *People v. Watson* (1956) 46 Cal.2d 818, 836.

Garcia has the better argument. "When the jury is 'misinstructed on an element of the offense[,] . . . reversal . . . is required unless we are able to conclude that the error was harmless beyond a reasonable doubt' " under *Chapman*. (*People v. Wilkins* (2013) 56 Cal.4th 333, 348.) "This is because the federal Constitution requires 'criminal convictions to rest upon a jury

38

determination that the defendant is guilty of every element of the crime . . . beyond a reasonable doubt,' " a requirement that is violated if a jury instruction "relieves the prosecution of its burden to prove an element of the crime." (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.) Here, the People's burden to prove that Garcia knew her act was dangerous to human life at the time she acted was reduced by the trial court's instruction that this element was met if she had the required knowledge at any time after she armed herself. Thus, the error violated the federal Constitution, and the *Chapman* standard applies.

In the context of an instructional error " ' "misdescri[bing] . . . the elements" ' of the charged offense," *Chapman* requires reversal "unless the reviewing court is persuaded that ' " '[n]o reasonable jury' " would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence' [citation]. When making this evaluation, the reviewing court ' "does not . . . 'become in effect a second jury to determine whether the defendant is guilty.' [Citation.] Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' [Citation.] . . . . '[S]afeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' " (*People v. Schuller* (2023) 15 Cal.5th 237, 261.)

Applying this standard, we conclude the trial court's response to the jury's question was prejudicial. To begin with, the record does not foreclose

39

the possibility that the jury determined Garcia acted with implied malice and thus relied on the court's answer to reach its second degree murder verdict. That verdict could have resulted from a finding of either express or implied malice, and the prosecutor argued both theories. Moreover, we tend to agree with Garcia that there was little evidence of an intent to kill, such that "implying malice from the dangerousness of her conduct seems likely to have presented the path of least resistance to a murder verdict." Finally, the very fact the jury asked about implied malice signals it was at least considering whether that theory applied.

The jury's question suggests the jury was unsure whether Garcia knew her act was dangerous to human life at the moment she stabbed Alderete. There was evidence that when she stabbed him, she could not see clearly because he had just choked her and she did not know where she was swinging the knife. A rational juror could rely on this evidence, combined with the fact that Garcia stabbed Alderete only once and in the shoulder, to form a reasonable doubt about whether she had the requisite knowledge at the moment of the stabbing to establish she acted with implied malice.

But by conveying that it was sufficient if Garcia knew her act was dangerous at any time "from when she decide[d] to arm herself with a knife until the victim [was] stabbed," the trial court invited the jury to find the requisite knowledge based on her earlier, more abstract understanding of the dangerousness of stabbing someone with the knife. Crucially, there was evidence of a concrete gap between when Garcia armed herself and when the stabbing occurred. Although her ultimate story was that she grabbed the knife from next to the bed and almost immediately stabbed Alderete, the prosecution's theory, which was supported by substantial evidence, was that she retrieved the knife from the kitchen before returning to the primary

40

bedroom and stabbing him. A juror who was unsure what Garcia knew at the time she stabbed Alderete could also reasonably conclude that she knew when she retrieved the knife from the kitchen, or at some other point before the stabbing, that the knife could kill someone. Thus, we are unable to conclude beyond a reasonable doubt that the verdict would have been the same even if the court had correctly answered the jury's question.

The Attorney General's arguments for why the error was harmless are unpersuasive. First, the Attorney General claims that "any potential harm was avoided" because of the other instructions given, including CALCRIM No. 520. But as we have said, the question about the knowledge element of implied malice showed the jury was confused about a concept on which it had already been properly instructed. We cannot presume the jury disregarded the trial court's incorrect answer to its specific question and instead applied general instructions it did not fully understand.

Second, the Attorney General highlights the evidence "support[ing] the conclusion that [Garcia] harbored the mental component of implied malice when she killed Alderete." But our role is to "assess whether any reasonable jury could have" rejected a finding of implied malice absent the instructional error, not to undertake our "own weighing of the evidence and . . . assessment of witness credibility." (*People v. Schuller*, *supra*, 15 Cal.5th at p. 262.) It does not matter how strong the evidence of implied malice was as whole so long as a rational juror could form a reasonable doubt about whether Garcia knew her act was dangerous to human life at the time she stabbed Alderete. (See *id.* at pp. 261–262; *In re Lopez* (2023) 14 Cal.5th 562, 591.)

In sum, the trial court erred by answering the jury's question in a manner that permitted the jury to convict Garcia of implied malice murder even if it did not believe she knew her criminal act was dangerous to human

41

life at the time she performed it. We are also unable to conclude beyond a reasonable doubt that the error did not affect the verdict. Therefore, Garcia's murder conviction must be reversed.

> **B.** *The Trial Court Did Not Err in Admitting the Part of the Interrogation that Occurred After the 13-minute Gap.*

Having concluded that the murder conviction must be reversed, we next consider Garcia's claim that the trial court erred by denying her *Trombetta/Youngblood* motion to exclude the portion of her interrogation that occurred after the 13-minute gap and her related claim that her trial counsel rendered ineffective assistance by failing to seek to exclude this evidence under section 859.5. We address these issues because they affect Garcia's conviction of witness dissuasion and may arise again in a retrial.

> **1.** The law governing Garcia's motion

The Fourteenth Amendment's due process clause requires the government "to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment," without regard to "the good faith or bad faith of the prosecution." (*Trombetta*, *supra*, 467 U.S. at p. 480; *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*).) The government also has a duty to preserve "evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta*, at pp. 488–489.)

The government's duty to preserve evidence that is only *potentially* exculpatory is more limited. Although "the good or bad faith of the State [is] irrelevant when the State fails to disclose . . . material exculpatory evidence," the calculus is different when the government "fails to retain evidence that is

42

potentially useful to the defense." (*Youngblood*, *supra*, 488 U.S. at p. 57; *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8, italics omitted.) "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Youngblood*, at p. 58.)

Accordingly, "there is a distinction between *Trombetta*'s 'exculpatory value that was apparent' criteria and the [*Youngblood*] standard . . . for 'potentially useful' evidence. If the higher standard of apparent exculpatory value is met," a due-process violation is established. (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 773 (*Alvarez*).) "But if the best that can be said of the evidence is that it was 'potentially useful,' the defendant must also establish bad faith on the part of the police or prosecution." (*Ibid.*) The bad-faith issue "turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood*, *supra*, 488 U.S. at pp. 56–57, fn. *.) Whereas "a calculated effort to circumvent the [*Brady*-related] disclosure requirements" would suggest bad faith, mere negligence in failing to preserve potentially exculpatory evidence is insufficient. (*Trombetta*, *supra*, 467 U.S. at p. 488; *Youngblood*, at p. 58.)

We review a trial court's ruling on a *Trombetta/Youngblood* motion for substantial evidence. (*Alvarez*, *supra*, 229 Cal.App.4th at p. 774.) In doing so, we consider " 'the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value' in support of the court's decision. [Citation.] ' " ' " 'If the circumstances reasonably justify the [trial court's] findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " (*Ibid.*)

2. Additional facts

Before trial, Garcia moved to exclude the balance of her interrogation after the 13-minute gap, which included her shifting claims after her original story of stabbing Alderete in the kitchen and statements about telling V. not to talk to the police. Garcia argued that under *Trombetta*, the police officers "were well aware of [her] self-defense claims," meaning that her interrogation statements "would be crucial to the prosecution as they spent three hours extracting a confession." Also, the prosecution "should have been aware that statements from an interrogation [could] be used" to impeach adverse witnesses, "possibl[y] exculpat[e]" Garcia, and "determine the voluntariness of her statement." Garcia argued that bad faith was established under *Youngblood*, because "the police and the prosecutor acted contrary to acceptable procedures by failing to contact technical support staff or service provide[r]s . . . to recover the missing footage or . . . request the error or system logs/documentation for the failures to record."

The prosecution opposed the motion, arguing that Garcia failed to demonstrate the materiality of "any evidence that theoretically *could have* been obtained (i.e.[,] the [system] logs)." Although the prosecution acknowledged that footage of the missing portion of the interrogation was "material, this was not evidence that could have been preserved—it never existed." Finally, bad faith was not established, as "the loss of footage [was] largely explained by technical issues" and there was "no evidence of malfeasance . . . by the officers."

The trial court held an evidentiary hearing on the motion at which numerous witnesses testified. In line with the evidence at trial, the testimony at the hearing established that the 13-minute gap occurred because Officer Tenorio's and Detective Brown's body-worn cameras stopped

44

recording after approximately one hour and 16 minutes, due to the prerecord time and administrative shut-off time, and the Milestone system stopped recording several times. The police officers and district attorney testified in more detail about their efforts to determine what happened and recover the missing footage or memorialize what happened during the gap. The district attorney also testified that she did not recall anything "exculpatory" being said during the gap. Nor did the officers threaten Garcia or try to get her to change her story, although Sergeant Curmi's tone became more confrontational.

Unlike at trial, technical witnesses also testified about both systems. A witness certified to install and program Milestone systems testified for the prosecution that a number of errors could have stopped the recording, such as going offline. If the system went offline, it would not be apparent to someone watching the livestream. The Milestone system generates error log reports, although it is not always possible to "assess what happened." A police IT technician testified that he was not asked to retrieve the Milestone error logs until a few days before the evidentiary hearing, which was too late because they are erased after 30 days.

A defense expert in media forensic analysis opined that (1) it was unlikely the Milestone system errors would have occurred without being apparent to someone watching through the livestream and (2) the gaps in the body-worn camera footage were not caused by the administrative shut-off feature because they were off by several seconds from the expected one hour and 16 minutes. The expert also testified that the body-worn cameras have "state capture information," which pertains to the cameras' electrical functioning, but the relevant information had been erased by the time he requested it from the police department.

After the evidentiary hearing, the trial court denied the motion. As to the interrogation's missing portion, the court found there was "absolutely no evidence in the record that anything in those 12 to 13 minutes" was "potentially useful," much less "exculpatory." There was also "affirmative evidence" that "there were no threats made during the interview, that there was no express or implied threat, that there was nothing untoward engaged in by the officers."

As to the body-worn cameras, the trial court questioned whether it had ever been explained why the state capture information that was not preserved could "be seen as potentially useful to the defense." Observing that there was "very persuasive evidence . . . that explains why the body cameras stopped recording," the court did not find it "suspicious" or "diabolical" that the recordings ran "a few seconds over" one hour and 16 minutes. In particular, the court discounted the defense expert's opinion that the "recordings should not have gone into the seconds," given his lack of expertise with WatchGuard. The court concluded there was "no inference to be drawn" from the additional seconds that could be combined with any other evidence to demonstrate bad faith.

As to the Milestone system, the trial court determined there was "no evidence that the failure to record a portion of [Garcia's] statement was volitional." Although the court recognized the system's malfunction was "certainly something that gives people pause," there was no indication that "anyone affirmatively took any measures to stop the interview[-]room camera from recording." And although "in hindsight" it might be that the police department "should have done more" to preserve the error logs that were lost, bad faith was not established merely because "law enforcement did not ask the kinds of questions that the defense now believes should have been part of

46

the investigation." In other words, "a lack of knowledge [could not] be seen as the equivalency of bad faith."

        3.     The trial court properly denied Garcia's motion.

On appeal, Garcia does not contest that there was substantial evidence to support the trial court's finding that she failed to show the police officers or prosecution acted in bad faith. Instead, she claims the exculpatory value of the missing evidence was apparent, meaning "*Youngblood*'s bad faith standard" did not apply and the trial court should have evaluated her claim exclusively under *Trombetta*. We are not persuaded.

Garcia relies on section 859.5 to support her claim that the exculpatory value of the unrecorded portion of the interrogation was apparent.[23] As discussed further below, section 859.5 generally requires that any custodial interrogation of a murder suspect be electronically recorded. (§ 859.5, subd. (a).) The statute originally applied only to interrogations of minors, but in 2017 it was extended to adults. (*People v. Cervantes* (2020) 55 Cal.App.5th 927, 937.) In expanding section 859.5, the Legislature found that "[e]vidence of a defendant's alleged statement or confession is one of the most significant pieces of evidence in any criminal trial. Although confessions and admissions are the most accurate evidence used to solve countless crimes, they can also lead to wrongful convictions. When there is a complete recording of the entire interrogation that produced such a statement or confession, the

---

[23] Garcia also briefly argues that unpreserved error logs and other metadata from both camera systems had apparent exculpatory value because "without such data, it is not possible to determine definitively whether the [13]-minute gap in the recording resulted from technical glitches in or intentional manipulation of the systems' equipment." We fail to see how this data was anything more than potentially useful to the defense, especially given the lack of other evidence that anyone intentionally interfered with the systems.

factfinder can evaluate its precise contents and any alleged coercive influences that may have produced it." (Stats. 2016, ch. 791, § 1, subd. (a)(3).) The Legislature identified the benefits of recording interrogations to include "decreas[ing] wrongful convictions," "enhanc[ing] public confidence in the criminal justice process," "prevent[ing] disputes" about police conduct during an interrogation, "prevent[ing] a defendant from lying about the account of events [the defendant] originally provided to law enforcement," and conserving judicial resources by avoiding "the need to assess which account of an interrogation to believe." (*Id.*, § 1, subd. (b).)

Seizing on this legislative history, Garcia argues that "[w]hen an interrogation is not recorded in its entirety, the exculpatory value of any missing portion is *necessarily* apparent." (Italics added.) She explains, "One need not know the content of what was not recorded to understand that the loss of some portion of it impairs the factfinder's ability to 'evaluate its precise contents and any alleged coercive influences' that may have affected the remainder of the interrogation." (Quoting Stats. 2016, ch. 791, § 1, subd. (a)(3).) According to Garcia, "even if no coercion occurred" during the 13-minute gap, "*any* missing segment of a recording made in this context [would have] exculpatory value" in that it "was likely to have just as significant a bearing on whether she had committed a lesser offense (or any at all) as what was said during the recorded portion." (Italics added.)

To the extent Garcia invites us to hold, as a matter of law, that any unrecorded portion of any interrogation of a murder suspect has exculpatory value, we decline to do so. Here, there was substantial evidence from which the trial court could conclude that the 13-minute gap did not have apparent exculpatory value. (See *Alvarez*, *supra*, 229 Cal.App.4th at p. 778.) The recorded portions on either side of the gap suggest the subjects discussed

48

during it were Alderete's infidelity and Garcia's interactions with I., the facts of which were uncontested. There was testimony that Garcia was not threatened or coerced into changing her story during the unrecorded portion. Thus, the court did not err by applying *Youngblood* to determine whether it should exclude the portion of the interrogation after the gap.

    4.  Garcia's claim of ineffective assistance of counsel fails.

  Garcia also contends her trial counsel rendered ineffective assistance by failing to seek to exclude the challenged evidence under section 859.5. Again, we are not persuaded.

  To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate "that counsel's performance was deficient," such that "counsel was not functioning as the 'counsel' [constitutionally] guaranteed," and "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Centeno* (2014) 60 Cal.4th 659, 674.) Thus, a defendant must show both that (1) "counsel's performance . . . fell below an objective standard of reasonableness under prevailing professional norms" and (2) there is "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

  When analyzing a claim of ineffective assistance of counsel, we "defer[] to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*Mai, supra*, 57 Cal.4th at p. 1009.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Ibid.*) But "a court need not

determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland v. Washington, supra*, 466 U.S. at p. 697.)

Section 859.5, subdivision (a) (section 859.5(a)), establishes the general requirement that "a custodial interrogation of any person . . . suspected of committing murder . . . shall be electronically recorded in its entirety." (§ 859.5(a).) "[A]ll of the following remedies shall be granted as relief for noncompliance" with this requirement: (1) the failure "shall be considered by the [trial] court in adjudicating motions to suppress a statement of a defendant made during or after a custodial interrogation"; (2) the failure "shall be admissible in support of claims that a defendant's statement was involuntary or is unreliable, provided the evidence is otherwise admissible"; and (3) "the court shall provide the jury with an instruction . . . that advises the jury to view with caution the statements made in that custodial interrogation." (§ 859.5, subd. (e).)

Section 859.5(a)'s requirement that custodial interrogations of murder suspects be recorded in full does not apply under certain enumerated circumstances, including when "[t]he failure to create an electronic recording of the entire custodial interrogation was the result of a malfunction of the recording device, despite reasonable maintenance of the equipment, and timely repair or replacement was not feasible." (§ 859.5, subd. (b).) If the prosecution relies on one of these circumstances "to justify a failure to make an electronic recording of a custodial interrogation, the prosecution shall show by clear and convincing evidence that the exception applies." (§ 859.5, subd. (c).)

Garcia argues that a violation of section 859.5(a) was undoubtedly established, given the 13-minute gap, and "a motion on statutory grounds" would have shifted the burden to the prosecution to prove by clear and convincing evidence that the malfunction exception applied. Thus, she claims, "a reasonably effective attorney would have recognized that section 859.5 provided an alternative, and arguably stronger ground for rendering evidence of the interrogation inadmissible and securing other valuable remedies for the defense."

In her opening brief, Garcia does not detail why the purported ineffective assistance was prejudicial, instead incorporating her discussion of prejudice from the denial of her *Trombetta/Youngblood* motion. But the prejudice analysis is not the same. As the Attorney General aptly observes, "per se exclusion" of a defendant's interrogation statements is not one of the remedies for a violation of section 859.5(a). Thus, the question is to what extent Garcia failed to obtain the statutory remedies and whether that prejudiced her, not whether the admission of the portion of the interrogation after the 13-minute gap was prejudicial.

Viewed in this light, defense counsel's failure to bring a motion under section 859.5 was clearly harmless. The first remedy for a violation of section 859.5(a) is that the failure to record "be considered by the court in adjudicating motions to suppress a statement of a defendant made during or after a custodial interrogation." (§ 859.5, subd. (e)(1).) To the extent the *Trombetta/Youngblood* motion amounted to a motion to suppress part of Garcia's statement, the trial court obviously considered the 13-minute gap in ruling. Likewise, Garcia obtained the second remedy, for the failure to "be admissible in support of claims that a defendant's statement was involuntary or is unreliable." (§ 859.5, subd. (e)(2).) Significant evidence about the gap

51

was admitted at trial, and she was able to argue that her statements after the gap were unreliable based on her testimony about threats made during it.

Finally, although Garcia did not receive the statutory remedy of an instruction "to view with caution the statements made in [the] custodial interrogation" violating section 859.5(a) (§ 859.5, subd. (e)(3)), there is no reasonable probability that the absence of such an instruction affected the verdict. (See *Mai*, *supra*, 57 Cal.4th at p. 1009.) The remedial instruction, which section 859.5 directed was "to be developed by the Judicial Council" (§ 859.5, subd. (e)(3)), is in the Bench Notes to CALCRIM No. 358, the form instruction on a defendant's out-of-court statements. The Bench Notes provide that "[i]f a defendant suspected of murder made a statement in a custodial interview that did not comply with . . . section 859.5," the following instruction should be given: "Consider with caution any statement tending to show defendant's guilt made by (him/her) during *<insert description of interview, e.g., interview with Officer Smith of October 15, 2013>*." (Judicial Council of Cal., Crim. Jury Instns. (2025) Bench Notes to CALCRIM No. 358.) Although this instruction was not given, the jury was instructed under other portions of CALCRIM No. 358 that it should "[c]onsider with caution" any unrecorded statements by Garcia tending to show her guilt and that it was responsible for "decid[ing] how much importance to give" her prior statements, authorizing it to consider the circumstances under which they were made. Especially given the defense's extensive discussion of the 13-minute gap in closing, the absence of an instruction advising caution with regard to Garcia's interrogation specifically was harmless.

C.   *The Trial Court Properly Instructed the Jury on a Different Form of Witness Dissuasion than that Originally Charged.*

Garcia also claims the trial court prejudicially erred by instructing the jury on the elements of a different crime—dissuading a witness from

52

*reporting* a crime—than the one she was charged with in count two—dissuading a witness from *prosecuting* a crime. We are not persuaded.

1. Additional facts

We begin by reviewing the evidence relevant to count two. When interviewed by the police on the day of the killing, V. reported that after Garcia told V. "she had to put the knife on [Alderete]" because "he was choking her," Garcia told V. "to be quiet and not say" anything to the police because Garcia "d[id]n't want to go to jail." But in both her subsequent interview months after the killing and her trial testimony, V. denied that Garcia told her not to say anything to the police about what happened.

During her interrogation, Garcia initially stated she could not remember what she said to her daughters after stabbing Alderete. She then admitted she told V. "not to talk to the police," explaining she was "scared" the police would "blame [her] for something that [she] just defended [her]self on." At the end of the interrogation, Garcia clarified that she told her daughters not to say anything to the police because she was going to talk to the officers herself. She testified to the same effect at trial.

Count two of the information charged Garcia with dissuading a witness from prosecuting a crime under section 136.1, subdivision (b)(2) (section 136.1(b)(2)), which we will refer to as dissuading prosecution. The count alleged that Garcia "did unlawfully attempt to prevent and dissuade [V.] . . . , a witness of a crime, from causing a complaint, indictment, information, probation and parole violation to be sought and prosecuted and assisting in the prosecution thereof."

Both parties requested CALCRIM No. 2622, the form instruction on all forms of witness dissuasion under section 136.1. As relevant here, alternative 1B of the form instruction pertains to dissuading a person "from

making a report" to law enforcement that "someone else . . . was a victim of a crime" under section 136.1, subdivision (b)(1) (section 136.1(b)(1)), which we will refer to as dissuading reporting. (CALCRIM No. 2622.) Alternative 1C of the form instruction pertains to dissuading a person "from cooperating or providing information so that a [charging document] could be sought and prosecuted, and from helping to prosecute that action," that is, to dissuading prosecution. (*Ibid.*)

The trial court instructed the jury on the elements of count two with alternative 1B of CALCRIM No. 2622 as follows: "The defendant is charged in Count 2 with intimidating a witness in violation of . . . section 136.1. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant tried to prevent or tried to discourage [V.] from *making a report to law enforcement that someone else was the victim of a crime*; two, [V.] was a witness; and, three, the defendant knew she was trying to prevent or trying to discourage [V.] from making a report to law enforcement and intended to do so." (Italics added.) The conference on jury instructions was not reported, and Garcia's trial counsel did not object to the instruction on count two when given the opportunity to memorialize objections on the record.

In closing argument, the prosecutor relied on the elements of dissuading reporting, not dissuading prosecution. Garcia's trial counsel did not object to the prosecutor's statement of the law, and the defense's closing argument did not address count two at all.

The verdict form for count two, to whose form the defense acquiesced, stated that the jury found Garcia "**GUILTY** of the crime of dissuading a witness from reporting a crime in violation of Penal Code section 136.1(b)(2) as alleged in Count 2 of the Information filed herein." In other words,

although the verdict form referred to section 136.1(b)(2), the provision under which Garcia was charged with dissuading prosecution, it used the language from section 136.1(b)(1), the provision under which the jury was instructed on dissuading reporting.

        2.      Analysis

"Section 136.1 prohibits multiple versions of the crime of dissuading a witness." (*People v. Morones* (2023) 95 Cal.App.5th 721, 733.)  The three subparts of section 136.1(b) "refer generally to different stages of a criminal proceeding:  subdivision (b)(1) refers to reporting crimes, subdivision (b)(2) refers to prosecutions, and subdivision (b)(3) refers to arrests." (*People v. Reynoza* (2024) 15 Cal.5th 982, 1012.)

As relevant here, dissuading reporting has different elements than dissuading prosecution.  Section 136.1(b)(1), the provision on which the jury was instructed, makes it a crime to dissuade a victim or witness to a crime from "[m]aking any report of that victimization to any peace officer or state or local law enforcement officer or . . . prosecuting agency."  A conviction under this provision requires proof that " ' "(1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from making any report of their victimization to any peace officer or other designated officials."  [Citation.]  The prosecution must also prove the defendant specifically intended that [the defendant's] acts would prevent or dissuade the victim or witness from making the report.' " (*People v. Serrano* (2022) 77 Cal.App.5th 902, 909–910.)

Section 136.1(b)(2), the provision under which Garcia was charged, makes it a crime to dissuade a victim or witness to a crime from "[c]ausing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof."  Thus, although the

first two elements of dissuading prosecution are the same as the first two elements of dissuading reporting, for the former crime the defendant must have intended to dissuade the victim or witness from causing a charging document to be filed and assisting in its prosecution, not from reporting the victimization to law enforcement. (See *People v. Reynoza, supra*, 15 Cal.5th at pp. 986–987; *People v. Brackins* (2019) 37 Cal.App.5th 56, 66.)

The parties disagree about the rubric under which we should analyze Garcia's claim. Garcia argues the trial court deprived her of due process by failing to instruct on all the elements of the crime with which she was charged, dissuading prosecution. The Attorney General responds that although Garcia was originally charged with that crime, "she consented to having the jury consider the [dissuading reporting] offense" and was not prejudiced by the variance between the offense charged and the offense submitted to the jury.

We conclude that "[t]he crux of the matter here is simply whether the trial judge committed prejudicial error by instructing the jury on [dissuading reporting] when the crime was not explicitly charged in the accusatory pleading." (*People v. Fugit* (2023) 88 Cal.App.5th 981, 993.) As *Fugit* observed, "a trial court may permit amendment of the information ' "at any stage of the proceeding, up to and including the close of trial," ' if the defendant's substantial rights are not violated (unless the new offense is not supported by evidence at the preliminary hearing). [Citations.] Moreover, there is 'no difference in principle between adding a new offense at trial by amending the information and adding the same charge by verdict forms and jury instructions.' " (*Id.* at pp. 993–994.) In such a situation, "a failure to promptly object will be regarded as a consent to the new charge and a waiver of any objection based on lack of notice." (*People v. Toro* (1989) 47 Cal.3d 966,

56

976, disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.)

Here, Garcia did not object to the challenged instruction on the record, did not object to the prosecutor's closing argument on dissuading reporting, and did not object to the verdict form using the "reporting" language. As a result, she consented to the constructive amendment of the information to allege the offense of dissuading reporting. Moreover, even if she had not consented, she fails to identify any prejudice from the amendment. She does not challenge the sufficiency of the evidence of dissuading reporting, and she disclaims any complaint about lack of notice. Rather, she insists that she was convicted of dissuading prosecuting, not dissuading reporting, and the verdict was therefore "constitutionally defective" because the jury was not instructed on the former offense. As explained, we disagree with her view of what occurred below, and we instead conclude the jury was correctly instructed on the properly substituted offense of dissuading reporting.

Finally, we agree with the Attorney General that the reference to section 136.1(b)(2) instead of section 136.1(b)(1) on the verdict form is immaterial. " ' " 'A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court,' " ' " and " '[t]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice.' " (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272–1273.) For the reasons given above, we conclude that the jury intended to convict

Garcia of dissuading reporting, and no prejudice resulted from the error on the verdict form.[24]

D.    *There Was No Cumulative Error Requiring Reversal of the Witness-dissuasion Conviction.*

Garcia also claims that even if the errors she identified were harmless individually, they were cumulatively prejudicial. Since her murder conviction must be reversed, we limit our assessment to the alleged errors that affected her conviction of witness dissuasion: the instruction on the elements of that offense, the denial of her *Trombetta/Youngblood* motion, and her trial counsel's failure to also rely on section 859.5 in bringing that motion. Because we have concluded that no error occurred in the first two respects, there is no error to aggregate. Therefore, her claim of cumulative error fails.

E.    *The Trial Court Must Hold a New* Pitchess *Hearing.*

Finally, at Garcia's request, we have attempted to review the trial court's denial of her *Pitchess* motion for disclosure of information in Officer Walsh's personnel records. The court ruled after conducting an in camera review of those records, but the hearing was not reported, and we have no other information about the documents considered or withheld. Thus, we must conditionally reverse the balance of the judgment and remand for a new *Pitchess* hearing.

1.    Additional facts

Before trial, Garcia filed a *Pitchess* motion seeking police records of any misconduct by Officer Walsh that reflected on the officer's "character for 'truthfulness.'" The motion attached a letter from the prosecution advising

---

[24] The abstract of judgment also incorrectly reflects that Garcia was convicted under section 136.1(b)(2). On remand, the trial court should ensure that the new abstract of judgment refers to section 136.1(b)(1).

the defense, pursuant to *Brady*, that "there may be potential impeachment evidence relating to [Officer Walsh] which may be obtained through a *Pitchess* motion." In an accompanying declaration, Garcia's trial counsel averred that the officer "was first on the scene, took custody of [V. and K.] at the scene, transported them to [the] police department in her vehicle, and supervised both minors for nearly three hours before interviewing them." Thus, particularly given V.'s importance as a percipient witness, evidence of the officer's prior misconduct could benefit the defense on crucial issues.

At a hearing on the motion, the trial court decided to conduct an in camera review of Officer Walsh's personnel records. A minute order reflects that the in camera hearing was then held and the court denied the motion.

After Garcia raised a *Pitchess* claim in her opening brief, we discovered that the appellate record did not include a reporter's transcript of the in camera hearing or any other documentation of the basis for the challenged ruling. In response to our order augmenting the record on appeal with these materials, the court reporter who attended the in camera hearing submitted a declaration stating she was unable to locate her notes for it. The superior court also informed us that it did not retain copies of the documents reviewed in camera.

### 2. Analysis

*Pitchess* held that "a criminal defendant [can] 'compel discovery' of certain relevant information in the personnel files of police officers by making 'general allegations which establish some cause for discovery' of that information and by showing how it would support a defense to the charge [or charges] against [the defendant]." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1018–1019.) This holding was later codified in Evidence Code sections 1043 through 1047 and sections 832.5, 832.7, and 832.8.

(*People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*); see *Warrick*, at p. 1019.) *Pitchess* and the resulting statutory scheme attempt to balance a criminal defendant's "due process right to a fair trial" with an officer's "strong privacy interest." (*Mooc*, at p. 1227.)

To obtain discovery of an officer's personnel records, a defendant must file a motion that includes an affidavit establishing "good cause" for the discovery, "setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records." (Evid. Code, § 1043, subd. (b)(3).) Where, as here, the trial court concludes the defendant "made a showing of good cause, the custodian of records should bring to court all documents 'potentially relevant' to the defendant's motion." (*Mooc*, *supra*, 26 Cal.4th at p. 1226.) If the custodian "does not produce the entire personnel file for the court's review," the custodian must establish under oath "what documents or category of documents" were excluded and explain the decision to exclude them. (*People v. Guevara* (2007) 148 Cal.App.4th 62, 69; *Mooc*, at p. 1229 & fn. 4.) The court then conducts an in camera review of the documents and, subject to various "statutory exceptions and limitations," discloses to the defense any " 'information [that] is relevant to the subject matter involved in the pending litigation.' " (*Mooc*, at p. 1226, quoting Evid. Code, § 1045, subd. (a).)

A ruling on a *Pitchess* motion is reviewed for an abuse of discretion. (*Mooc*, *supra*, 26 Cal.4th at p. 1228.) Here, we cannot evaluate the challenged ruling. The in camera hearing was not reported, meaning we have no record of the trial court's reasoning, including which documents the trial court reviewed. (See *id.* at pp. 1228–1229.) We also have no record of which, if any, documents the custodian of records did not produce for the

court's review.  (See *id.* at p. 1229; *People v. Guevara*, *supra*, 148 Cal.App.4th at p. 69.)  Thus, the record is inadequate to permit meaningful review of Garcia's claim, and on remand the court must hold a new in camera hearing on her *Pitchess* motion.  (*Mooc*, at p. 1228; *Guevara*, at p. 69.)

III.

DISPOSITION

The murder conviction and sentence on that count are reversed, and the balance of the judgment is conditionally reversed.  The matter is remanded with directions to hold a new in camera hearing on Garcia's *Pitchess* motion and ensure both that the hearing is reported and that a record is made of the personnel records reviewed.  If the trial court finds there are discoverable records and Garcia was prejudiced by the denial of discovery, the records shall be produced.  If the court again concludes that no records are discoverable or Garcia fails to establish prejudice from any undisclosed records, the court shall reinstate her conviction for witness dissuasion only.  In either case, the court shall thereafter conduct further proceedings consistent with this opinion.

_____

Humes, P. J.

WE CONCUR:


_____

Banke, J.


_____

Langhorne Wilson, J.

*People v. Garcia*  A164991